FILED

2015 Feb-27  PM 03:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| BRUCE L. STINSON, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 7:13-cv-1593-KOB |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

On June 22, 2010, the claimant, Bruce Stinson, applied for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act. (R. 26). The claimant initially alleged in both applications disability commencing on November 8, 2008 because of a knee injury, a back injury, and nerve damage in his right arm. (R. 26, 179). The claimant amended his alleged onset date to May 28, 2009, during the administrative hearing. (R. 53). The Commissioner denied the claims initially. (R. 26). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on December 8, 2011. *Id*.

In a decision dated January 23, 2012, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for supplemental security income. (R. 35). On July 3, 2013, the Appeals Council denied the claimant's request for review; consequently,

1

the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II.  ISSUES PRESENTED

The claimant presents the following issues for review:

(1)    whether substantial evidences supports the ALJ's finding that the claimant has the residual functional capacity to perform a full-range of light work without the ALJ obtaining a medical source opinion to assess the claimant's limitations; and

(2)    whether the ALJ properly included the required "function-by-function" assessment in determining the claimant's residual functional capacity.

## III.  STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.

2

389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.  LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The instant controversy revolves around the ALJ's determination of the claimant's residual functional capacity. Residual functional capacity (RFC) is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Residual functional capacity is assessed at both the fourth and fifth stages of the sequential evaluation process. *See* 20 C.F.R. § 404.1520(e), (f).

The ALJ has a basic duty to develop a full and fair record; that duty, however, does not require the ALJ to secure a medical source opinion regarding the claimant's RFC. *See* 20 C.F.R. § 404.1546(c). "The failure to include [an RFC assessment from a medical source] at the State agency level does not render the ALJ's RFC assessment invalid." *Langley v. Astrue*, 777 F. Supp. 2d 1250, 1261 (N.D. Ala. 2011); *see Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923–24 (11th Cir. 2007). An ALJ's RFC determination is not a medical assessment, but is "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 404.1545(a)(1).

The ALJ's duty to fully develop the record "requires the ALJ to order a consultative evaluation when such an evaluation is necessary to make an informed decision." *Smith v.*

*Commissioner*, 501 F. App'x, 875, 878 (11th Cir. 2012). The ALJ's duty to order a consultative examination can be triggered when an inconsistency in the evidence exists or the medical record as a whole does not support a determination on the disability claim. 20 C.F.R. §§ 416.903(a), 416.919. However, the ALJ does not err in denying a request for a consultative examination if substantial evidence supports the ALJ's decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209–10 (11th Cir. 1988); *see also Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984).

A single decision maker (SDM) assessment is not a medical source, and conclusions of a SDM are not entitled to any weight. *Siverio v. Comm'r of Soc. Sec.*, 461 F. App'x 869, 871–72 (11th Cir. 2012) ("[T]he SSA's Program Operations Manual System ("POMS") explicitly distinguishes RFC assessments produced by an SDM from those produced by a medical consultant, and states that 'SDM-completed forms are not opinion evidence at the appeals level.'"); *see accord Hall v. Astrue*, 2012 WL 2499177, *2–3 (N.D. Ala. Jun. 22, 2012) (finding ALJ erred in "affording any weight, even minimal weight," to the SDM's assessment). State agency adjudicator opinions are not included in 20 C.F.R. § 404.1513(a), listing acceptable medical sources. Accordingly, SDM opinions are not entitled to any weight.

In assessing the claimant's RFC, if the ALJ finds the claimant can do unlimited types of work at a given exertional level, the law does not require the ALJ to use a vocational expert to determine what kinds of work a claimant can do on the national level. *Welch v. Bowen*, 854 F.2d 436, 438–39 (11th Cir. 1988). Instead, the ALJ can rely solely on the grids to determine that work exists in significant numbers in the national economy that the claimant is capable of completing. *Id.* However, the ALJ may not rely on the grids if the claimant has nonexertional impairments that limit basic working skills. *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985); *see also Broz v.*

*Schweiker*, 677 F.2d 1351, 1361 (11th Cir. 1982).

Social Security Ruling 96-8p provides that the RFC assessment

> must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

1996 WL 374184 (July 2, 1996), at *1.  The ALJ must first assess the claimant's functional limitations and restrictions and then expresses his functional limitations in terms of exertional levels. *See Castel v. Comm'r of Soc. Sec.,* 355 F. App'x 260, 263 (11th Cir. 2009); *Freeman v. Barnhart,* 220 F. App'x 957, 959–60 (11th Cir. 2007); *see also Bailey v. Astrue,* 5:11-CV-3583-LSC, 2013 WL 531075 (N.D. Ala. Feb. 11, 2013).

The ALJ must consider all of the relevant evidence in assessing the claimant's functional limitations, including:

> medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations, if available.

SSR 96-8p, 1996 WL 374184, at *4–*5.  However, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to show that the ALJ considered the claimant's medical condition as a whole.  *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005); *see also Castel,* 355 F. App'x at 263.

6

## V.  FACTS

The claimant has a high school education and was fifty-two years old at the time of the administrative hearing.  (R. 52).  His past work experience includes employment as a boilermaker and a painter.  (R. 22).  The claimant alleges that he is unable to work because of a knee injury, back injury, and nerve damage to his right arm.  (R. 29).  Originally, he alleged an onset date of November 8, 2008 (R. 179); he later amended his alleged onset date to May 28, 2009.  *Id.*  The ALJ found several severe impairments, including: diabetes mellitus, degenerative disc disease of the thoracic and lumbar spine, osteoarthritis of the left knee, and hypertension.  (R. 28).  On appeal, the claimant contested the ALJ's finding as to his residual functional capacity in light of these severe impairments, as well as the non-severe impairments of a history of drug and alcohol abuse, PTSD, and depression.  (R. 29).

*Physical Limitations*

The claimant visited the Birmingham Veterans Affairs Medical Center (VAMC) numerous times, from August 15, 2008 to May 3, 2011, reporting pain in his low back and neck.  (R. 243, 335, 320, 289, 389, 431, 422, 846).  On August 15, 2008, Dr. Christian L. Jimmerson examined the claimant's spine and noticed multilevel discongenic disease, worse at the C4-C5, C5-C6, and C6-C7 with anterior osteophytes, as well as facet arthropathy.  (R. 243–244, 373).  At this visit, Dr. Jimmerson provided the claimant Lortab for the pain in his back and neck.  (R. 373).

On October 1, 2008, the claimant reported back and right knee pain to Dr. Jimmerson at a 10 on a scale of 1 to 10.  At this visit, he told Dr. Jimmerson that he would be going to Missouri to work on boilers and would need something for pain.  Dr. Jimmerson noted: "will continue current regimen." (364–65).

7

The claimant's left knee pain began on October 6, 2008, when the claimant sustained injuries to his left knee after hitting his knee on a bolt while working on a boiler in Missouri.  On the night of the accident, he called 911 to be lifted from the roof where he was working because his knee had become swollen and painful, and he could not transport himself.  Later, he found a piece of metal in his knee, which he eventually massaged out, causing damage to a nerve.  On October 13, 20008, the claimant went to a local Missouri clinic for his knee injury.  (R. 352, 680).

The claimant later visited the emergency room at the Birmingham VAMC on November 9, 2008, for continued knee pain, stating that his knee pain had persisted for three weeks after his accident with the boiler.  (R. 352, 363).  The claimant rated his left knee pain at a 10 out of 10.  (R. 357).  At this visit, Mr. Robert D. Kachelhofer, a radiologist, under the supervision of Dr. Nicholas Van Wagoner, reviewed an x-ray of the claimant's left knee, finding no acute fracture or subluxation, and no joint effusion or focal soft tissue abnormality.  (R. 243).  Ms. Sharon L. Beal, RN, also under the supervision of Dr. Van Wagoner, instructed the claimant to take one Lortab tablet every six hours for one week to relieve pain and to return to the emergency room if his symptoms worsened.  (R. 352).

On November 17, 2008, the claimant visited Mr. Luis Gonzales, a physical therapist at the VAMC, under the supervision of Dr. Jimmerson.  Mr. Gonzales provided the claimant with a knee brace for his knee pain from his arthralgia and instructed him on how to use the brace.  (R. 271).

On December 2, 2008, Dr. Jimmerson of the VAMC had the claimant sign a chronic narcotic treatment contract.  The claimant expressed continued knee pain at this visit.  (R. 345).

On January 25, 2009, the claimant visited the VAMC emergency room again, this time complaining of exacerbation of back pain and specifically requesting "narcotic pain relief."  The

8

claimant denied any injury or activity that prompted the pain in his back. At this visit, the claimant told Dr. Jason E. Gunn that he had taken all of his Lortab pills previously prescribed by Dr. Jimmerson and denied that he received 60 pills earlier in the month. He stated that he purchased pain pills "on the street" because he did not have his own prescription supply. Dr. Gunn offered the claimant muscle relaxants for pain relief, which the claimant refused. Dr. Gunn only provided the claimant with four Lortab pills, instructing the claimant to "follow up in blue clinic [his primary care doctor's office] tomorrow if he is to receive any further narcotics." (R. 335–36).

On February 10, 2009, the claimant visited another physical therapist, Mr. Jojit T. Enriquez, under the supervision of Dr. Christian L. Jimmerson, for his knee pain. The claimant stated to Mr. Enriquez that pain pills helped him manage the pain and swelling but that he is still bothered by the pain; he gave a current pain rating of 8 out of 10 at that visit. Mr. Enriquez determined that the claimant's rehabilitation potential was excellent; the claimant's treatment plan included physical therapy three times per week for four weeks. (R. 261–65, 329).

On February 11, 2009, the claimant visited Dr. Jimmerson again regarding his knee pain. Dr. Jimmerson refilled the claimant's Lortab prescription, and the claimant indicated the Lortab helped with his pain. However, when the claimant returned to Dr. Jimmerson on February 24, 2009, Dr. Jimmerson could not refill the claimant's Lortab prescription because of the claimant's cocaine use in violation of his pain treatment contract. (R. 325, 328).

On March 22, 2009, the claimant visited Dr. Paul M. Perry at the VAMC emergency room complaining of low back pain from a prior injury, worsening from picking up his kids. Dr. Perry's records indicate that the claimant previously took Lortab for pain but violated his pain contract by using cocaine. Dr. Perry offered the claimant muscle relaxers, but the claimant refused them, stating

9

that he has not benefitted from them in the past and that "Lortab is the only thing that works for his pain." Dr. Perry only gave him a two days' supply of Lortab and said that he can discuss further treatment with his primary care provider. Dr. Perry also treated the claimant for elevated blood pressure; however, the claimant left before getting his blood pressure stabilized. (R.320–22).

On October 8, 2009, the claimant visited Valetra M. Turner, Patient Support Assistant, and she noted an "issue of repeat prescriptions," likely because of the claimant's repeated requests for Lortab. (R. 317). Dr. Jimmerson had similarly noted the issue of repeat prescriptions on October 27, 2008. (R. 364).

On May 25, 2010, the claimant made a walk-in visit to his primary care physician, Dr. Jimmerson, and again requested medicine refills. The record notes indicate that Delores Grayson, RN, notified his doctor of this request but do not indicate if he received the refills. (R. 307).

On May 26, 2010, Dr. Michael Gates, a treating physician at the VAMC emergency unit, examined the claimant's lungs, heart, and skeletal structures because the claimant complained of chest pain. Dr. Gates found that the lungs, heart, and mediastinum were unremarkable and "the skeletal structures were within normal limits except for moderate degenerative changes in the thoracic spine and small bilateral cervical ribs." Dr. Gates advised the claimant that his blood pressure was high and that he needed to keep a check on his weight. (R. 242, 297, 310).

On June 1, 2010, the claimant visited the Birmingham VAMC for a follow-up visit regarding his elevated blood pressure. At this visit, the claimant stated that his mid- and low-back have continued to give him pain and that he fell over the weekend when his left leg gave out. The claimant said the pain in his low back was the primary source of his pain and described that pain as continual and throbbing, ranking the severity at a 9 out of 10. Nurse practitioner Veronica A.

Maxwell noted "will refill Lortabs per Dr. Jimmerson."  (R. 289–290).

On August 3, 2010, L.N. Hickman, a non-examining state agency single decision maker, assessed the claimant's residual functional capacity.  Mr. Hickman indicated that the claimant could occasionally lift and/or carry up to 20 pounds at a time; frequently lift and/or carry up to 10 pounds at a time; stand, walk, and sit for about 6 hours in each 8-hour workday; and push and pull arm or leg controls with no restriction.  As to postural limitations, Mr. Hickman opined that the claimant could climb ramps and stairs occasionally but never ladders, ropes, or scaffolds.  Mr. Hickman did not, however, support this assertion with any explanation.  Mr. Hickman expressed no manipulative, visual, or communicative limitations.  Mr. Hickman indicated that the claimant should avoid all exposure to hazards, stating in his explanation only "avoid unprotected heights."  Mr. Hickman then concluded that the claimant's medically determinable impairments could reasonably be expected to produce some stated symptoms and functional limitations but not at the level of severity alleged by the claimant.  (R. 85–92).

Mr. Hickman also completed a physical summary on August 3, 2010, stating that the claimant alleged knee injury, back injury, and nerve damage to right arm. This report reviewed the claimants medical records from the Veterans Administration Medical Center from June 2, 2008 to July 11, 2010.  (R. 386).

On September 7, 2010, the claimant again reported mid- to low-back pain to his primary care provider at the VAMC, nurse practitioner Veronica A. Maxwell.  At this visit, Ms. Maxwell examined an MRI of the lumbar spine and found "mild heterogeneity of bone marrow signal and density, probably due to chronic anemia" and "mild degenerative changes of the lumbar spine . . . without significant central canal or neural foramina stenosis."  (R. 389–91).

The claimant began using a straight cane on September 7, 2010 in accordance with the recommendation of physical therapist Robert Lane Ferreira.  On September 21, 2010, notes commenting on his use of the cane stated that the claimant entered the exam room with a steady gait, using the cane effectively.  (R. 432–36).

The claimant made routine visits to his primary care provider and saw nurse practitioner Veronica Maxwell on September 21, 2010 and October 28, 2010.  (R. 431, 423).  The claimant complained of continuous chronic back pain at both of these visits and said that he takes Lortab with effective pain control. (R. 431).  He also mentioned needing physical therapy for pain in his back and lower leg at the September visit.  (R. 434). At the October visit, Ms. Maxwell noted that the claimant's blood pressure was elevated and refilled his Lortab prescription under the authority of Dr. Mason for chronic back pain.  (R. 422).

On December 6, 2010, the claimant visited nurse practitioner Veronica Maxwell complaining of left shoulder pain.  An x-ray of the claimant's left shoulder by Dr. Sara George indicated that "there may be a tiny inferior acromial osteophyte" but there were no acute fractures or dislocations and unremarkable soft tissues.  (R. 489).

The claimant began residing at a Veterans Affairs Residential Rehabilitation Treatment Program (RRTP) at the Tuscaloosa VA Medical Center in March of 2011 after he became homeless. (R. 61).  On March 24, 2011, a Healthcare for Homeless Veterans Program treatment plan update, documenting the claimant's past drug abuse and rehabilitation plan, indicated that the claimant began using cocaine during his service around 1978 and that he attempted to quit three times in the past but "this time is for me."  (R. 709).

On March 29, 2011, a RRTP nursing assessment indicated that the claimant's back and knee

were in pain at an intensity level of 4 out of 10 and that tramadol relieves the pain. In this report, the claimant indicated that he had been residing at the Salvation Army for about three weeks because of the foreclosure of his home. He reported that he has not worked or received any income since his knee injury with the boilermaker but that he has applied for Social Security disability benefits. He stated that he has used cocaine in the past and that his last use was March 3, 2011. The assessment reflected that the claimant would benefit from substance abuse and PTSD groups, as well as assistance with his compensation claims. The plan for assisting the claimant notes "help with claims and housing." (R. 694).

On May 3, 2011, the claimant, at a routine health care visit to his primary care physician Dr. Jimmerson, again reported pain and asked about getting his pain medications started back. His legs and ankles were swollen at this visit, and LPN Kristy Whitlow informed him that the swelling was normal. (R. 846–47).

On May 27, 2011, a pharmacologic stress test conducted by Dr. Luvenia Wilcox Bender at the Birmingham VAMC was normal. (R. 819–23).

On June 17, 2011, Dr. Rudy E. Vuchinich, psychologist at the Tuscaloosa Veterans Affairs Medical Center, issued a statement diagnosing the claimant with PTSD. (R. 773–74).

On September 16, 2011, another x-ray of the claimant's knee conducted by Dr. Essie Parker at the Tuscaloosa VAMC showed no fracture or dislocation, "minimal" arthritis, and "mild enthesopathy." (R. 811).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a hearing before an ALJ on

13

December 8, 2011. (R. 47). At the hearing, the claimant testified that his pain in his lower back and left knee most affect his capacity to work. (R. 65). However, the claimant also noted pain in his wrists from nerve damage, some pain in his right knee, PTSD, and a history of drug abuse. (R. 64).

Regarding the effects of his alleged pain, the claimant testified that he can stand for only about thirty minutes a time because his knees go out; can walk on flat, level ground for about a half a block; and sit for about thirty-five or forty minutes, changing positions often. He also indicated that he lays down for about four or five hours per day during the daylight hours and sleeps for about eight and a half hours at night. To control the pain, the claimant said that he takes Lortabs four times per day and, occasionally, Tramadol. He indicated that he does not use other methods to relieve his pain such as heating pads or ice packs. (R. 62, 65).

The claimant testified that he currently resides at the Veterans Affairs Domiciliary Residential Rehabilitation Treatment Program, where he has lived since March 2011, and that he will remain there until he finds other housing. In addition to the above pain medications, the VA Domiciliary also provides the claimant with treatment for various other medical problems, including PTSD, diabetes, kidney disease, osteoarthritis, as well as alcohol and cocaine dependence. (R. 54).

The ALJ questioned the claimant regarding his past drug use. The claimant stated that he has not used drugs since coming to the VA Domiciliary approximately nine and a half months prior to the hearing; the claimant indicated that he was clean for an even longer period of six years in 1990 when he lived in a Pathfinder halfway house. When asked by the ALJ if he could remain clean from drug use outside of the controlled environment of the Domiciliary facility, the claimant testified that he would be able to refrain from drug use. (R. 61, 65).

Regarding his work history, the claimant testified that he worked as a commercial painter

14

from 1980 until he began his apprenticeship as a boilermaker in 1995, where he remained until 2008 when he injured his knee.  The claimant testified that after the injury a doctor in Boulder, Missouri, where the incident occurred, removed the metal from his knee and drained the fluid from it.  He testified that after the accident he transferred from working on boilers to working in a "tube trailer, basically just sitting down" because he could no longer perform his previous work.  Prior to working as a painter and a boilermaker, the claimant served in the United States Army in South Carolina from 1978 to 1980 until he was honorably discharged as an MP2.  The claimant's military service caused his PTSD; specifically, the claimant witnessed the killing of another soldier during a training exercise.  (R. 56–59).

The claimant stated that he has "flashes of PTSD" and takes medication to treat the PTSD symptoms.  He noted that medication and therapy are helping with his nightmares and sleeping but that he still struggles with PTSD.  (R. 66–67).

When asked about the activities he participates in at the VA Domiciliary, the claimant testified  that he volunteers assisting tornado victims, participates in social events, and could drive if he had a car.  He testified that he gets along with others, watches movies, and has no trouble with his memory.  He does chores at the VA Domiciliary, such as taking out the trash and replacing the trash bags.  The claimant also expressed his ability to perform daily activities such as cooking, grocery shopping, managing his money, taking care of his personal hygiene, and using a telephone. The claimant said that when given free time, he goes to visit his mother in Birmingham, Alabama. (R. 69–73).

When the ALJ asked him if he could conceive of any situation in which he could perform some kind of regular work or if he was done working, he replied "I'm done."  When the ALJ

inquired about the claimant's plan to secure housing and take care of himself if he was not found disabled, the claimant simply replied, "I don't know."  The claimant also indicated to the ALJ that he had not visited the state vocational rehabilitation office to seek additional assistance.   The ALJ encouraged the claimant to seek out such assistance that may provide the claimant opportunities to work in a non-physically taxing environment.  (R. 73–74).

When questioned by his attorney, the claimant expressed that he cannot sit for long periods of time, cannot pick up anything that he would have to hold for long periods of time, and can only walk short distances such as a half of a block.  He said that he uses a cane prescribed by his doctor. Further, the claimant testified that the trash he takes out is a small trash can and that he only transports it a short distance.  He further stated that the heaviest items that he can lift at the grocery store are bread and milk.  (R. 74–75).

When asked by his attorney to rank his pain on a scale from 1 to 10, the claimant expressed a pain level of 7 in his lower back that he experiences daily.  He said that he takes Lortab that soothes the pain but does not stop it.  The claimant indicated, at his attorney's request, that he could pick up a key from the table with one hand and that he experienced problems with dropping items, such as a can of soda, frequently.  (R. 75–76).

With respect to his diabetes, the claimant testified that he takes insulin daily, checks his blood sugar four times a day, and takes shots about four times a month.  When asked what symptoms inform him that his blood sugar is high, he replied that he breaks into a cold sweat, he becomes hot or lightheaded, and his feet and ankles swell.  (R. 77–79).

The ALJ asked the claimant about the attempted nerve conduction study to ascertain if he had carpal tunnel; the claimant replied that he was unable to complete the procedure because it was too

16

painful.   The claimant also indicated that he wears braces for his wrists.  (R. 78–79).

A vocational expert, Ms. Strickland, testified concerning the classification of the claimant's past work and the ability of someone with the claimant's limitations to perform that work or other work.  She indicated that the claimant's work as a boilermaker is medium skilled with an SVP of 7 with no transferable skills to light or sedentary work.  The ALJ noted that the VA doctors declined to provide an opinion regarding the claimant's functional limitations.  The ALJ then asked Ms. Strickland to assume that the claimant was a forty-nine year old individual at the alleged onset date with a high school education and a history of medium work with an SVP of 7.  The ALJ further posited that the proposed individual could sit for 35–40 minutes; stand for 30 minutes at a time; walk less than one block at a time; lift, carry, push and pull 10 pounds or less occasionally; and could not sit, stand or walk sufficiently to complete a normal eight-hour workday or a forty-hour workweek. Ms. Srickland responded that an individual under these constraints could not perform any of the claimant's past work as he did it, as it is generally done, or other full-time work. (R. 80).

The ALJ concluded by saying, "[l]ike most cases, this one turns on RFC, and now I've got to figure out what to do with the period before [the claimant] reached the age of 50, and whether this is the viable RFC at that point, or not."  (R. 81).

*The ALJ's Decision*

On January 23, 2012, the ALJ determined that the claimant was not disabled under the Social Security Act.  The ALJ found that the claimant met the insured status requirements of the Social Security Act through September 30, 2012 and had not engaged in substantial gainful activity since the alleged onset of disability.  The ALJ found that the claimant suffered from severe impairments of diabetes mellitus; degenerative disc disease of the thoracic and lumbar spine; osteoarthritis of the

17

left knee; and hypertension. The ALJ found the claimant's history of drug and alcohol abuse, PTSD, and depression as non-severe. He found, however, that none of the claimant's impairments, singly or in combination, manifested the specific signs and diagnostic findings required by the Listing of Impairments. Consequently, the ALJ concluded that the claimant had the residual functional capacity to perform a full-range of light work. (R. 26–30).

To support his conclusion, the ALJ noted that the claimant's diabetes mellitus did not prevent the claimant from performing light work activity because his symptoms, according to the medical evidence, were controlled with medication. The ALJ found that the claimant occasionally requires insulin and uses prescription diabetic shoes as a precautionary measure, but he found that the claimant's neurological examinations were normal and he had no deficits in his cranial nerve function, motor strength, sensation, or reflexes. Thus, the ALJ concluded that the claimant's diabetes symptoms were not disabling and that the claimant can perform light work. (R. 32).

Next, the ALJ considered the claimant's back and neck pain. The ALJ pointed to medical records showing that, although x-rays of his spine indicated degenerative disc disease and a fracture of the transverse process, overall the claimant responded well to oral medication and physical therapy. The ALJ further noted that the claimant had no significant ambulation difficulties and had only one exacerbation of his back pain in 2009 because of heavy lifting. Thus, the ALJ found that his back and neck pain were not disabling. (R. 32).

Based on x-rays showing only mild osteoarthritis but no joint effusion, fracture, dislocation, or other abnormality, the ALJ found that the claimant's knee pain was not disabling to the extent alleged. The ALJ also referenced medical records indicating that the claimant responded well to medication and physical therapy. The ALJ concluded that the evidence of his daily living activities

and lack of ambulation difficulties further supported the conclusion that the claimant's knee pain was not disabling.  (R. 32).

The ALJ found that the evidence related to his hand and wrist pain similarly did not support disabling symptoms that would preclude light work.  The ALJ noted that the claimant cooks, does laundry, washes dishes, and fishes—all requiring frequent movement of the hands and wrists.  The ALJ further stated that no documented evidence showed significant problems with his hands; the only medical evidence relevant to his wrist pain was an incomplete nerve conduction study, showing possible neuropathy at the wrist. (R. 32–33).

Regarding the pain in the claimant's arm and shoulder, the ALJ concluded that the objective evidence did not support disabling pain that would prevent work activity.  He noted that no medical evidence demonstrated chronic or disabling pain; an x-ray of the left shoulder demonstrated "a tiny inferior acromial osteophyte at the AC joint but otherwise unremarkable." Moreover, the ALJ noted that the claimant's daily activities such as performing household chores, shopping, visiting, engaging in social activities, volunteering, watching television, playing bingo, and reading showed that his arm pain was not disabling.  (R. 32–33).

The ALJ determined that the claimant's hypertension was minimally restrictive and did not preclude substantial gainful activity.  In support of his decision, he noted that although "the objective medical evidence established a diagnosis and treatment for hypertension," the claimant's hypertension was controlled with oral medication.  Further, the claimant's cardiac examinations were completely normal with no history of shortness of breath or dyspnea on exertion.  (R. 33).

In assessing the claimant's residual functional capacity, the ALJ rejected the nonexertional limitations in the assessment by the state agency adjudicator, L.N. Hickman, noting that the

treatment records do not support his opinion and that the adjudicator is not a physician.  As to the claimant's functional limitations, the VA doctors declined to give an opinion.  However, the ALJ found that the longitudinal treatment records were "comprehensive and provide a substantial and rational basis for assessing residual functional capacity."  (R. 33–34).

Regarding the claimant's functional limitations, the ALJ noted that nothing in the medical record precludes the claimant from lifting up to 20 pounds at a time with frequent lifting and carrying of up to 10 pounds, walking or standing for about 6 hours in an 8 hour day, pushing and pulling arm or leg controls, performing basic mental functions in a work setting necessary for unskilled work, and performing basic mental work activities.  Thus, the ALJ held that the claimant has the residual functional capacity to perform a full-range of light, unskilled work as defined at 20 C.F.R. § 404.1567(b) by direct application of Medical Vocational Rule 202.14.  (R. 34).

The ALJ found, accordingly, that the claimant cannot do his past relevant work as a boilermaker, as it was extertionally medium and semi-skilled.  However, the ALJ concluded that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  Thus, the ALJ determined that the claimant was not disabled.  (R. 35).

## VI.  DISCUSSION

The claimant argues that the ALJ improperly relied solely upon his own personal opinion and the opinion of a single non-medical source in assessing the claimant's residual functional capacity and that the ALJ failed to perform the required function-by-function assessment.  To the contrary, this court finds that the ALJ properly considered all the relevant evidence in determining the claimant's residual functional capacity and properly performed a function-by-function assessment,

20

and that substantial evidence supports his decision.

*Issue I: The ALJ's Residual Functional Capacity Assessment*

The claimant asserts that the ALJ's RFC assessment is based solely upon his own unqualified medical judgment and the opinion of a single non-medical source.  The claimant specifically contends that the ALJ should not have assessed his residual functional capacity absent the benefit of a medical source opinion.  This court disagrees, finding that a medical source statement was not necessary because substantial evidence supported the ALJ's decision.

The ALJ has a basic duty to develop a full and fair record.  However, the regulations nowhere provide that a record is incomplete if a medical source does not provide a statement regarding the plaintiff's functional limitations.  To the contrary, the regulations explicitly state: "the lack of [a] medical source statement will not make the report incomplete."  20 C.F.R. § 404.1513(b)(6); see *Langley v. Astrue*, 777 F. Supp. 2d 1250, 1261 (N.D. Ala. 2011).  The ALJ's duty to fully develop the record does not require him to order a consultative evaluation unless such an evaluation is necessary to make an informed decision.  *See Smith v. Commissioner*, 501 F. App'x, 875, 878 (11th Cir. 2012).

In the present case, the ALJ specifically referenced the medical evidence and the testimony of the claimant upon which he relied.  He pointed to x-rays showing only moderate degenerative changes and mild arthritis in the claimant's spine and records documenting the significant reduction of the claimant's back pain from medication and exercising.  The ALJ also referenced x-rays of the claimant's knee demonstrating only mild osteoarthritis but no joint effusion or other abnormality.  The ALJ noted that although the claimant had been prescribed a knee brace, he remained independent of activities of daily living with no ambulation difficulties.  With respect to the

21

claimant's diabetes, the ALJ noted that according to the VA treatment notes his symptoms are controlled with medication.  (R. 31–34).

The ALJ further relied upon the claimant's own testimony of his activities to support his residual functioning capacity assessment.  He referenced the claimant's ability to perform household tasks, wash dishes, do laundry, grocery shop, engage in social activities, fish, attend church, visit his mother, volunteer with tornado victims, and attend AA meetings.  (R. 31).

Thus, the ALJ did not rely solely upon his own opinion in assessing the claimant's residual functional capacity.  Because substantial evidence supports the ALJ's decision and a medical source statement is not required to make the record complete, the claimant's argument that the ALJ erred by failing to consider a medical source statement in assessing the claimant's residual functional capacity is unavailing.

Further, just as the ALJ did not rely solely upon his own opinion, the ALJ also did not rely exclusively upon the opinion of the state agency adjudicator, as the claimant asserts.  The ALJ properly acknowledged that the state agency adjudicator was not a physician and rejected the nonexertional limitations found by the state agency adjudicator where they were inconsistent with the physician's records.  (R. 33).

A state agency adjudicator is not a medical source and his conclusions are not entitled to any weight. *Siverio v. Comm'r of Soc. Sec.*, 461 F. App'x 869, 871–72 (11th Cir. 2012).  Because a state agency adjudicator's opinion is not entitled to any weight, the ALJ did not err in failing to credit SDM Hickman's conclusions regarding the claimant's nonexertional limitations.

Moreover, here, Mr. Hickman did not provide any explanation for his proposed postural limitations, as the instructions on the assessment form require.  Accordingly, the ALJ was correct

in affording no weight to Mr. Hickman's conclusions regarding the claimant's nonexertional limitations.

The ALJ was also proper in relying upon the grids to determine what work in the national economy the claimant can perform.  In assessing the claimant's RFC, the ALJ can rely exclusively upon the grids if he determines that the claimant can perform unlimited types of work at a given exertional level.  *Welch v. Bowen*, 854 F.2d 436, 438–39 (11th Cir. 1988).  In this case, the ALJ concluded, based upon substantial evidence, that the claimant has the capacity to perform a full-range of light work, without any nonexertional limitations.  And, as illustrated above, the ALJ's rejection of the SDM's nonexertional limitations was proper.  Thus, the ALJ's reliance on the grids was appropriate, and substantial evidence supports his RFC finding.

### Issue 2: Function-by-Function Assessment

The claimant further contends that the ALJ failed to perform a function-by-function assessment prior to expressing the claimant's RFC in terms of exertional levels.  However, to the contrary, the ALJ did discuss the claimant's specific functional limitations prior to assessing his RFC in terms of exertional level.

According to Social Security Ruling 96-8p, the ALJ must first assess the claimant's functional limitations and restrictions and then express his functional limitations in terms of exertional levels. 1996 WL 374184; *see Castel v. Comm'r of Soc. Sec.,* 355 F. App'x 260, 263 (11th Cir. 2009); *Freeman v. Barnhart,* 220 F. App'x 957, 959–60 (11th Cir. 2007); *see also Bailey v. Astrue,* 5:11-CV-3583-LSC, 2013 WL 531075 (N.D. Ala. Feb. 11, 2013).  Discussing the claimant's medical record and citing a regulation that defines the exertional demands of the claimant's RFC satisfies this requirement.  *See Castel v. Comm'r of Soc. Sec.,* 355 F. App'x 260, 263 (11th Cir.

2009); *Freeman v. Barnhart,* 220 F. App'x 957, 959–60 (11th Cir.2007).  The ALJ's decision does not have to reference every specific piece of evidence that the ALJ evaluated, as long as the decision shows that he considered the claimant's medical condition as a whole. *Castel,* 355 F. App'x at 263.

After thoroughly reviewing the relevant evidence in the record, as discussed above, the ALJ articulated that nothing in the record would preclude the claimant from frequently lifting up to 20 pounds, carrying up to 10 pounds, walking or standing a good deal, pushing and pulling arm or leg controls, and performing basic mental functions.  The ALJ rejected the nonexertional limitations in the state agency adjudicator's assessment, finding those limitations contrary to the objective medical evidence.   Accordingly, the ALJ then found that the preponderance of the medical evidence supported the assessment that the claimant can perform "a full-range of light, unskilled work" as defined at 20 C.F.R. § 404.1567(b) by direct application of the Medical Vocational Rule 202.14, and that such work exists in significant numbers in the national economy.  (R. 30–34).

This court concludes that the ALJ properly performed a function-by-function assessment prior to expressing the claimant's RFC in terms of exertional level and that substantial evidence supports his decision.  Therefore, this court affirms the decision of the Commissioner.

## VII.  CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.

A separate order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 27th day of February, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE